Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MARK Z., and M.Z.,<br><br>       Plaintiffs,<br><br>vs.<br><br>PRIORITY HEALTH MANAGED BENEFITS, INC., and the MICHIGAN DENTAL ASSOCIATION HEALTH PLAN,<br><br>       Defendants. | COMPLAINT<br><br>Case No. 2:21-cv-00650 - JNP |

Plaintiffs Mark Z. ("Mark"), and M.Z. through their undersigned counsel, complain and allege against Defendants Priority Health Managed Benefits, Inc. ("PHMB") and the Michigan Dental Association Health Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Mark and M.Z. are natural persons residing in Washtenaw County, Michigan. Mark is M.Z.'s father.

2. PHMB is a third-party administration company and was the claims administrator for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Mark was a participant in the Plan and M.Z. was a beneficiary of the Plan at all relevant times.

4. M.Z. received medical care and treatment at Evoke at Entrada ("Evoke") from July 20, 2018 to October 23, 2018, and Vista Sage ("Vista") from October 24, 2018 to May 9, 2019. Evoke is a licensed wilderness therapy program located in Utah which provides sub-acute short-term stabilization and assessment for adolescents with mental health, behavioral, and/or substance abuse problems. Vista is a licensed residential treatment program, also located in Utah. Vista provides sub-acute inpatient treatment for adolescent girls with mental health, behavioral, and/or substance abuse problems.

5. PHMB, acting as agent and claims administrator for the Plan, denied claims for payment of M.Z.'s medical expenses in connection with her treatment at Evoke and Vista. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse Mark for the medical expenses he incurred and paid for M.Z.'s treatment.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because the Plan provides coverage for treatment received throughout the United States and the treatment at issue took place in Utah. In addition, venue in Utah will save the Plaintiffs costs in litigating this case. In addition, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### M.Z.'s Developmental History and Medical Background

9. M.Z. was adopted at birth and was in the neonatal intensive care unit for a week before Mark and his wife, Paula, took her home. M.Z.'s birth father had a history of schizophrenia, bipolar disorder, and depression. M.Z.'s birth mother had a history of seizures and anxiety.

10. M.Z. was an active child and, although she interacted with other children she preferred the company of adults. She began speech therapy at three years of age when she started pre-school. M.Z. had difficulty identifying social cues and assisting her with that difficulty was added to her therapy.

11. M.Z. was struggling with completing her school work as early as second grade, and Mark and Paula sought an evaluation from their pediatrician. He diagnosed M.Z. with attention deficit/hyperactivity disorder ("ADHD") and M.Z. started taking medication for that condition.

12. Approximately one year later, a second assessment was done and M.Z. was also diagnosed with anxiety and depression. An Individualized Education Plan ("IEP") was

3

developed for M.Z. to assist her in school. She was being bullied, was acting out, and had poor peer relationships.

13. When she was in sixth grade, M.Z. was having difficulty sleeping and was diagnosed with sleep apnea. She began engaging in self-harm behavior (cutting), and she started seeing a psychiatrist. She was prescribed medication to address her depression, anxiety, ADHD and impulsivity.

14. Mark and Paula moved M.Z. to a new middle school because of the bullying she had been experiencing, but her self-harm continued. M.Z. began experimenting with drugs and alcohol. She was also engaging in risky sexual behaviors.

15. When M.Z. was sixteen, her doctor recommended participation in an outpatient adolescent treatment program, but the program failed to improve M.Z.'s conditions.

16. After M.Z.'s friends became aware that she was cutting herself, they called the police, who came to the family's home to investigate. M.Z. had started a partial hospitalization program a few days prior to the incident and continued in that program.

17. M.Z. had to do community service and school detention after she was caught with cigarettes at school.

18. On M.Z.'s seventeenth birthday, she was caught stealing money and gift cards from a fellow track team member. She was kicked off the team and was suspended from school for four days.

19. On one occasion when the family was preparing to leave for vacation, M.Z. had a severe panic attack. She begged to be allowed to stay behind with a friend's family. However, during her parents' absence, M.Z. continued using drugs and alcohol and was not staying

where she was supposed to be staying. When Mark and Paula got home, they discovered that M.Z. had a warrant for her arrest due to prior instances of theft.

20. Mark and Paula were gravely concerned with the deterioration of M.Z.'s condition and sought advice from her psychiatrist and an educational consultant who recommended that she receive treatment at Evoke.

21. M.Z. did well at Evoke and her conditions stabilized. Her therapist at Evoke recommended an updated psychological assessment. As a result of the assessment, M.Z. was diagnosed with:

> F43.20 Attachment Disorder
> F33.1 Major Depressive Disorder, recurrent, moderate, anxious distress
> F41.1 Generalized Anxiety Disorder
> Borderline Personality Disorder
> F12.20 Cannabis Use Disorder, in early remission in a controlled environment, severe
> Sedative, Hypnotic, or Anxiolytic Use Disorder, in sustained remission in a controlled environment, severe
> F90.0 Attention-Deficit/Hyperactivity Disorder, Predominantly Inattentive Type
> Z62.820 Parent-Child Relational Problem

22. Staff at Evoke strongly recommended ongoing residential treatment for M.Z. following her discharge from the program at Evoke.

### Evoke Claims and Appeal

23. M.Z. was admitted at Evoke on July 20, 2018, and was discharged on October 23, 2018. Claims were submitted to PHMB for coverage and payment of the expenses associated with M.Z.'s treatment at Evoke. On January 11, 2019, PHMB wrote and denied coverage on the basis that wilderness therapy programs were not a covered benefit under the terms of the Plan.

24. Mark and Paula appealed the denial of coverage on March 29, 2019. They alerted PHMB to its responsibilities under ERISA including the necessity to provide them with a full and

fair review, to consider all materials they provided with their appeal, to have any clinical review of the claim completed by an individual with equivalent qualifications and expertise to M.Z.'s treating doctors and therapists and to provide specific rationales for any ongoing denial. They also included contact information for Michael Gass, PhD., LMFT, at the University of New Hampshire, an individual with extensive knowledge of and experience with wilderness therapy treatment.

25. Mark and Paula then went on to discuss the definition of a Mental Health Treatment Facility found in their Plan. They stated that Evoke met all the requirements included in the definition to qualify for coverage.

26. Mark and Paula then raised the possibility that the Plan was not in compliance with the requirements of MHPAEA in excluding coverage for wilderness therapy programs. They compared the requirement for coverage of skilled nursing services found in the Plan and noted that because the Plan was excluding only subacute mental health treatment and not subacute treatment for other medical conditions, the Plan was imposing an impermissible limitation on mental health services.

27. Mark and Paula requested that, in the event the Plan continued to deny coverage, that they be provided with copies of all documents under which the Plan was established or operated, copies of all Administrative Services Agreements between the Plan, PHMB, and any other third party entity, and copies of criteria utilized to determine coverage for any type of subacute care under the Plan.

28. On May 2, 2019, PHMB wrote and maintained its denial of coverage. They stated again that wilderness therapy was not a covered service and, in addition, said the admission and treatment at Evoke had not been pre-authorized. The letter cited to the Plan provision

upon which the denial was based and indicated that the review had been completed by a family practice physician.

29. The letter concluded by informing Mark and Paula that the internal appeal process was complete. However, an external review was available upon request should they wish to pursue that option.

30. PJMB did not provide the documents and information Mark and Paula had requested.

### Vista Claims and Appeal

31. Claims were submitted to PHMB for coverage and payment of the medical expenses in connection with M.Z.'s treatment at Vista.  On November 20, 2018, PHMB wrote and denied coverage on the basis that M.Z. did not meet the Plan's guidelines for medical necessity of residential treatment.  PHMB asserted that M.Z. was "not exhibit[ing] any active mood, anxiety, or psychotic symptoms," was not "suicidal, homicidal, or psychotic," was not experiencing active withdrawal symptoms, and could be effectively treated on an outpatient basis.

32. An additional basis for denial was that the treatment provided at Vista was in a "luxury treatment program[s]," which are excluded.  The Plan definition of a luxury treatment program includes facilities in "secluded beach, mountain, or country settings" which provide non-therapeutic activities such as "horseback riding or swimming."

33. Mark and Paula appealed the denial on March 29, 2019.  They said that they had identified several errors in the denial and would address those errors in their appeal.

34. First, Mark and Paula reminded PHMB of its responsibilities under ERISA to provide a full and fair review, to consider all materials and information submitted in support of the

appeal, to provide specific rationale for maintaining denial, and to have the claim reviewed by an appropriately qualified clinician.

35. Mark and Paula then provided a detailed chronological history of M.Z.'s development, treatments, diagnoses, and difficulties. They included voluminous medical records, and letters of recommendation for residential treatment from M.Z.'s therapists. The letter included numerous citations to therapy notes from Vista, demonstrating her ongoing struggles.

36. Mark and Paula then addressed PHMB's determination that Vista was a luxury treatment program. They included with their appeal a copy of Vista's license with the state of Utah as a residential treatment facility and argued that the bulk of M.Z.'s time at Vista was spent either in therapy or in school. They also pointed out that the exclusion relied on by PHMB was not contained in their Plan document and directed PHMB to the following language, found in Priority Health Medical Policy #91447-R3:

> For self-funded plans, consult individual plan documents. If there is a conflict between this policy and a self-funded plan document, the provisions of the plan document will govern.

37. Mark and Paula then discussed PHMB's misuse of the medical necessity criteria. First, PHMB had erroneously utilized criteria for adult mental health rather than criteria for treatment of adolescents. Second, they argued that the presence of any of the symptoms enumerated by PHMB in its denial, *i.e.,* suicidality, homicidality, or psychosis, would indicate the need for acute psychiatric hospitalization. M.Z. was not receiving acute care at Vista but, rather, subacute residential treatment.

38. Mark and Paula included a letter from Michael Connolly, M.D., a child and adolescent psychiatrist, explaining the nature of subacute residential treatment.

39. Mark and Paula stated that a requirement for M.Z. to meet acute criteria in order to qualify for subacute care was a violation of generally accepted standards of practice.

40. Finally, Mark and Paula again raised their concerns about violations of MHPAEA. They stated that they had been unable to obtain guidelines for coverage of other types of subacute care and requested that those guidelines be provided to them. They pointed PHMB to the definition of "medically/clinically necessary" in their Plan and argued that M.Z.'s treatment at Vista clearly fell within the scope of that definition.

41. Mark and Paula again asked for the documents and information they had previously requested in the event PHMB maintained its denial of coverage.

42. On May 2, 2019, PHMB maintained its denial on the basis that Vista was a luxury treatment program providing treatment that was not evidence based and coverage was therefore excluded. PHMB also reiterated that M.Z.'s condition did not meet the medical necessity criteria. Finally, PHMB raised for the first time a failure to obtain prior approval before M.Z.'s admission at Vista[1].

43. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

44. The denial of benefits for M.Z.'s treatment was a breach of contract and caused Mark and Paula to incur medical expenses that should have been paid by the Plan in an amount totaling over $120,000.

45. PHMB failed to provide any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of Mark and Paula's requests.

---

[1] PHMB's letter did indicate that approval had been sought prior to M.Z.'s treatment and had been denied.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

46. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as PHMB, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

47. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

48. The denial letters produced by PHMB do little to elucidate whether it conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. PHMB failed to substantively respond to the issues presented in the Plaintiffs' appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

49. PHMB, the agent of the Plan, breached its fiduciary duties to M.Z. when it failed to comply with its obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in M.Z.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of M.Z.'s claims.

//

//

50. The actions of PHMB and the Plan in failing to provide coverage for M.Z.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

1. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of PHMB's fiduciary duties.

2. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

3. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits and not applied to medical and surgical benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

4. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of

benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

5. The Plan's blanket exclusion for "wilderness" and other outdoor behavioral health programs is an example of a benefit restriction based solely on geographic location. This exclusion enforces a denial of payment based entirely on where the care is administered rather than the quality or content of the treatment.

6. Evoke met rigorous state licensing and accreditation standards and offered treatment in accordance with generally accepted standards of medical practice. The Plan's blanket exclusion however takes none of this into account and denies treatment solely based on the fact that a significant portion of the treatment takes place outside.

7. The explicit language of the SPD, one of the governing plan documents, states that the Defendants will evaluate the medical necessity of treatment for purposes of evaluating coverage under the Plan of both mental health, substance use, medical, and surgical claims based on whether services are "widely accepted as effective," are "appropriate for the condition or diagnosis," and are "essential, based upon nationally accepted evidence-based standards."

8. The medical necessity criteria for sub-acute, or intermediate, inpatient mental health and substance use disorder treatment PHMB applied were more stringent or restrictive than the medical necessity criteria the Plan applied to sub-acute or intermediate level medical or surgical benefits.

9. Specifically, while the medical criteria applied to intermediate medical and surgical care are consistent with generally accepted standards of care for treatment of certain medical and surgical disorders following hospital discharge but before a patient is able

12

to return home, the criteria applied by the Plan to treatment of mental health and substance use disorders imposes requirements beyond generally accepted standard of medical practice; i.e., the utilization of standards for inpatient hospitalization to conditions where medically appropriate standard of care is in an intermediate care facility.

10. In addition, the level of care applied by PHMB failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

11. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

12. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits PHMB, as agent for the Plan, excluded for M.Z.'s treatment include sub-acute, or intermediate, inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

13. For none of these types of sub-acute inpatient treatment does the Plan exclude or restrict coverage of medical/surgical conditions by requiring patients to satisfy the medical necessity criteria for acute inpatient treatment. If it did so, the Plan would be violating the requirements of the SPD requiring that medical necessity be evaluating based on "nationally accepted evidence-based standards."

14. In its review of M.Z.'s claims from Vista, PHMB's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that M.Z. received.

15. PHMB's improper use of acute inpatient medical necessity criteria is revealed in multiple statements in PHMB's denial letters and include its allegations that M.Z. was not suicidal, homicidal, or psychotic. These reasons for denying coverage in sub-acute, intermediate level inpatient treatment accord with "generally accepted standards of medical practice" as required by the SPD.

16. Based on the SPD language, when the Plan receives claims for intermediate level treatment of medical and surgical conditions, it provides benefits and pays the claims as outlined in the terms of the Plan and based on, among other things, nationally accepted standards of care.

17. The imposition of requirements for coverage of the treatment at Vista that go beyond established standards of medical care for behavioral health treatment render the Plan's coverage for mental health and substance use disorder treatment inferior to the coverage it provides for analogous medical and surgical treatment.

18. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to nationally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

19. The Plan's use or application of acute inpatient medical necessity criteria in evaluating the medical necessity of M.Z.'s sub-acute inpatient treatment resulted in a disparity of coverage between mental health/substance abuse treatment and medical/surgical treatment because the Plan denied coverage for mental health and substance use

disorder benefits while at the same time evaluating the medical necessity of analogous levels of medical or surgical care under generally accepted standards of medical practice.

20. Had the Defendants applied nationally accepted standards of medical practice to its evaluation of M.Z.'s mental health and substance used disorders, benefits would have been paid for the treatment at Evoke and Vista.

21. In this manner, the Defendants' actions violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and PHMB, as written or in operation, use processes, strategies, or standards that limit the coverage for the Evoke and Vista treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, or standards the Plan uses to limit coverage for medical/surgical treatment such as skilled nursing and inpatient rehabilitation treatment.

22. PHMB and the Plan did not produce the documents Mark and Paula requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity Mark and Paula's allegations that PHMB and the Plan were not in compliance with MHPAEA in violation of 29 U.S.C. § 1133, its corresponding claim regulation, 29 C.F.R. § 2560.501-1, and the final rule for MHPAEA, 29 C.F.R. § 2590.712(d)(1)-(3).

23. The violations of MHPAEA by PHMB and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan and PHMB insured and administered plans as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

24. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for M.Z.'s medically necessary treatment at Evoke and Vista under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in the Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 2nd day of November, 2021.

By    s/ Brian S. King
       Brian S. King
       Attorney for Plaintiffs

County of Plaintiffs'
Residence: Washtenaw
County, Michigan